IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 4, 2024

FILED
AUG 09 2024
Clerk of the Appellate Courts
REc'd By_____

IN RE ELIZABETH Y.

Appeal from the Juvenile Court for Hamblen County
No. TR220017       Blake Sempkowski, Judge

_____

No. E2023-01448-COA-R3-PT

_____

In this case involving termination of the father's parental rights to his child, the trial court found by clear and convincing evidence four statutory grounds supporting termination. The trial court further determined that clear and convincing evidence established that termination of the father's parental rights was in the child's best interest. The father has appealed. Discerning no reversible error, we affirm the trial court's judgment in its entirety, including termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY ARMSTRONG, JJ., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Ethan H.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

On October 20, 2022, the Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Desiree Y. ("Mother") and Ethan H. ("Father") to their minor child, Elizabeth Y. ("the Child"), in the Hamblen County Juvenile Court ("trial court"). The Child was brought into protective custody shortly after her birth because (1) both Mother and the Child tested positive for amphetamines at the

hospital and (2) both parents were thereafter arrested, leaving the Child without a guardian. DCS averred that on September 7, 2022, the trial court had adjudicated the Child dependent and neglected. According to DCS, the trial court had also found that Mother had severely abused the Child due to her drug use while pregnant.

Although Father had been identified by Mother as the Child's biological father and had acknowledged paternity, DCS averred that no parentage action had been filed. DCS therefore alleged the statutory ground of failure to establish and exercise paternity, codified at Tennessee Code Annotated § 36-1-113(g)(9)(A)(v), as a ground for termination of Father's parental rights.[1] DCS also averred that two additional grounds relative to putative fathers were applicable: (1) failure to manifest a willingness and ability to take custody of the Child, *see* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii), and (2) risk of substantial harm to the Child's physical or psychological welfare if placed in Father's custody, *see* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). DCS further relied on the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child pursuant to Tennessee Code Annotated § 36-1-113(g)(14).[2] In addition, DCS asserted that termination of Father's parental rights was in the Child's best interest.

On October 24, 2022, the trial court appointed a guardian *ad litem* to represent the Child's interest. The trial court also appointed counsel for Father, whom the court had determined to be indigent.

The trial court conducted a bench trial on June 21, 2023, with Father and the DCS case manager providing testimony. The court entered a resultant order on September 12, 2023, wherein the court determined that Father's parental rights should be terminated. The court found that clear and convincing evidence established that Father had never filed a parentage action concerning the Child such that DCS had proven the ground of failure to establish paternity. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(v). The court further found that clear and convincing evidence established that Father had failed to manifest a willingness and ability to take custody of the Child, *see* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii), and that placing custody of the Child with Father would pose a risk of substantial harm to the Child's physical or psychological welfare, *see* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). In addition, the court determined by clear and convincing evidence that Father had failed to manifest an ability and willingness to assume legal and physical

---

[1] Inasmuch as Mother has not appealed the termination of her parental rights, we will confine our analysis to the facts and statutory grounds pertaining to Father.

[2] As this Court has previously explained, a parent's parental rights "may be terminated pursuant to statutory grounds found both at section 36-1-113(g)(1)-(8), as well as section 36-1-113(g)(9)(A)." *In re Katelyn R.*, No. M2023-00354-COA-R3-PT, 2024 WL 1299102, at *10 (Tenn. Ct. App. Mar. 27, 2024).

2

custody of or financial responsibility for the Child. *See* Tenn. Code Ann. § 36-1-113(g)(14).

The trial court proceeded to analyze the evidence applicable to the best interest factors enumerated in Tennessee Code Annotated § 36-1-113(i), making factual findings concerning those factors the court found relevant. The court then concluded that by "clear and convincing evidence, the Court finds that the factors enumerated in Tenn. Code Ann. § 36-1-113(i), as well as other factors considered by this Court, weigh in favor of termination of parental rights of . . . Father." The court accordingly terminated Father's parental rights. Father timely appealed.

## II. Issues Presented

Father presents the following issue for this Court's review, which we have restated slightly as follows:

> Whether the trial court erred in finding that termination of Father's parental rights was in the best interest of the Child.

Although Father presents this sole issue on appeal, we must also consider whether the trial court erred in finding clear and convincing evidence of the statutory grounds for termination. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) (directing appellate courts to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523-24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

3

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements

4

necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2022, to current)[3] lists the statutory requirements for termination of parental rights, providing in relevant part:

> (a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

> \* \* \*

> (c)    Termination of parental or guardianship rights must be based upon:

> > (1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> > (2)    That termination of the parent's or guardian's rights is in the best interests of the child.

In its final judgment, the trial court determined that clear and convincing evidence supported the following grounds for termination: (1) three grounds applicable to a putative father, pursuant to Tennessee Code Annotated § 36-1-113(9)(A)(iii)-(v), and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial

---

[3] Throughout this Opinion, unless otherwise noted, all statutory citations shall be made in reference to the version of the statute that was effective at the time the termination petition was filed on October 20, 2022. *See, e.g., In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4 (Tenn. Ct. App. Aug. 15, 2023). In some instances, the subsection that was in effect at the time of the amended petition's filing has not changed and therefore remains current.

responsibility for the Children, pursuant to Tennessee Code Annotated § 36-1-113(g)(14). We will address each statutory ground in turn.

### A. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

The trial court found clear and convincing evidence that Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (West July 1, 2022, to current) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Father's custody would pose a risk of substantial harm to the Child's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

### 1. Failure to Manifest Either an Ability or Willingness

Ability and willingness are distinct concepts. "If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d at 677. "Ability focuses on the parent's lifestyle and circumstances." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018); *see also In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) ("Mother failed to manifest an ability to personally assume legal and physical custody of the children because she was living an itinerant lifestyle, residing with friends or in her car, at the time DCS filed the termination petition.").

With respect to willingness, this Court has previously elucidated: "Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-

01937-COA-R3-PT, 2019 WL 1313237, at \*8 (Tenn. Ct. App. Mar. 22, 2019). Furthermore, "we look for more than mere words," *id.*, and "we have previously held that evidence was sufficient to meet this ground when it showed that the parent voluntarily chose to live a lifestyle lacking stability." *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at \*9 (Tenn. Ct. App. Nov. 25, 2019) (citing *In re Morgan K.*, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at \*13 (Tenn. Ct. App. Oct. 31, 2018)). Many of the same facts relevant to a parent's willingness apply to our analysis of a parent's ability inasmuch as both of these concepts may relate to a parent's "lifestyle." *Id.*; *In re Jonathan M.*, 2018 WL 5310750, at \*5.

In the case at bar, the trial court made the following findings of fact pertinent to this statutory ground: (1) Father was incarcerated at the time of trial and had been for most of the Child's life, (2) Father's actions leading to his incarceration demonstrated his failure to manifest a willingness and ability to assume custody, and (3) Father's only evidence concerning willingness consisted of Father's testimony at trial that he "wants to be a father." The court also found in its termination order that Father had been on notice concerning his parentage of the Child since at least March 24, 2022, when he was served with the original dependency and neglect action. Notwithstanding, Father had never filed a petition to establish his paternity. Based upon these findings, the trial court determined that DCS had established by clear and convincing evidence this statutory ground for termination. Upon thorough review, we agree.

With respect to Father's willingness, the record demonstrates that Father's lifestyle prior to incarceration was unstable at best. Father testified that he had a previous conviction for theft and was in violation of his probation at the time of the Child's birth. Moreover, the Child was born in a motel room in which the couple was residing because they had no other home. Upon arrival at the hospital following the Child's birth, Mother and the Child both tested positive for amphetamines, prompting the hospital employees to contact DCS. Upon investigation, DCS determined that Father had an outstanding warrant for his arrest. As a result of this warrant and Mother's positive drug test, both parents were arrested at the hospital, leaving the Child without a guardian.

According to Father, his arrest at the hospital was the result of a probation violation predicated on his failure to check in with his probation officer after his conviction for theft. Moreover, by the time of the termination trial, Father had been continuously incarcerated since his arrest at the hospital and therefore had been incarcerated for all but two days of the Child's entire life. In addition, Father testified during trial that he would not be released for another four months. Due to his incarceration, Father had not completed any of the requirements of his permanency plan. Father had also failed to file an action to establish paternity, failed to initiate or maintain contact with DCS, and failed to inquire about or maintain contact with the Child.

7

As the trial court noted, the timing of Father's incarceration for his probation violation demonstrated a lack of concern for the well-being of the Child. Father and Mother were living together in a motel room at the time of the Child's birth, and Father admitted that he had failed to abide by the terms of his probation during that timeframe. Due to his continuing incarceration by the time of trial, Father clearly lacked the ability to assume legal and physical custody of or financial responsibility for the Child. *See, e.g., In re Jeremiah S.*, 2020 WL 1951880, at *8 ("Mother has been incarcerated . . . about half of Jeremiah's life and nearly all of Joseph's, evidencing a clear inability to assume custody and financial responsibility, despite any amount of willingness."); *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018) (determining that the parents, who were both incarcerated at the time of trial, "lacked the ability to assume custody of the Children"). Father had also failed to take steps to establish paternity by the time of the termination trial even though he stipulated at trial that he was the Child's biological father. We therefore agree with the trial court that DCS proved by clear and convincing evidence that Father failed to manifest a willingness or an ability to assume custody of or financial responsibility for the Child.

## 2. Risk of Substantial Harm

In support of this statutory ground, DCS was also required to prove that returning the Child to Father's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d at 677. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *8 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

In evaluating this second prong, this Court has previously placed emphasis on facts revealing emotional harm and instability. *See In re Jeremiah B.*, No. E2022-00833-COA-R3-PT, 2023 WL 2198864, at *11 (Tenn. Ct. App. Feb. 24, 2023) (finding that "removing the Child from the stability of his foster home would contribute to the risk of substantial harm to his welfare"); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL

8

6312951, at *10 (Tenn. Ct. App. Nov. 25, 2019) ("Stability, as this Court has often recognized, is an 'extremely important' necessity for children."). Due to his incarceration, Father maintained no bond with the Child, and he would accordingly be considered a "virtual stranger." *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) ("[F]orcing the child to begin visitation with a near-stranger would make psychological harm sufficiently probable." (citing *Antonio J.*, 2019 WL 6312951, at *9)). Father had not maintained contact with the Child or with DCS during his incarceration and had demonstrated no ability to provide a stable environment for the Child.

Furthermore, the evidence demonstrated that the Child had developed a strong bond with her foster parents, who wished to adopt the Child. Kayla Parker, the DCS case manager, testified that the Child was happy in her foster placement, she got along well with the other children in the home, and the Child's special medical needs were met by the foster parents.[4] According to Ms. Parker, the Child's foster family was "the only family she knows," and the Child was extremely bonded to them and their extended family and would be traumatized if she were removed from that home. Father, on the other hand, had not expressed any concern for the Child to Ms. Parker and had not demonstrated any urgency toward providing for the Child's needs. Father had no relationship with the Child and had not seen her since he was arrested in the hospital shortly following the Child's birth. Ergo, placing the Child in Father's custody would be tantamount to placing her in the custody of a "near-stranger." *See In re Elijah H.*, No. M2020-01548-COA-R3-PT, 2021 WL 4593844, at *12 (Tenn. Ct. App. Oct. 6, 2021) ("This Court has previously determined that removing a child who has 'bonded and thrived' with his current family and placing a child in the custody of a near-stranger would amount to substantial harm." (citing *In re Braelyn S.*, 2020 WL 4200088, at *17)).

We therefore affirm the trial court's determination that clear and convincing evidence established that Father failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child and that returning the Child to his custody would pose a risk of substantial harm to her welfare.

B. Statutory Grounds Applicable to a Putative Father

The trial court also terminated Father's parental rights based upon three statutory grounds applicable to a putative father. Tennessee Code Annotated § 36-1-113(g)(9) (West July 1, 2022, to current) provides in pertinent part:

---

[4] Ms. Parker testified that the Child was diagnosed with neonatal abstinence syndrome shortly following her birth, and as a result, she required developmental therapy and had certain special needs.

9

(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

* * *

(iii) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(iv) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(v) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity[.]

As a threshold matter in reviewing the trial court's application of these statutory grounds, we must determine whether Father was a putative father at the time of the amended petition's filing. *See* Tenn. Code Ann. § 36-1-113(g)(9); *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *6 (Tenn. Ct. App. June 6, 2017). Tennessee Code Annotated 36-1-102(44) (West July 1, 2022, to July 1, 2023) defines a putative father as

a biological or alleged biological father of a child who, at the time of the filing of the petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, meets at least one (1) of the criteria set out in § 36-1-117(c), has not been excluded by DNA testing as described in § 24-7-112 establishing that he is not the child's biological father or that another man is the child's biological father, and is not a legal parent[.]

The version of Tennessee Code Annotated § 36-1-117(c) (West July 1, 2022, to May 11, 2023) in effect at the time of the termination petition's filing provided in relevant part:

The parental rights of the putative father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the

10

following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:

(1)     The biological father of a child has filed with the putative father registry, pursuant to § 36-2-318, as described in § 36-1-113(d)(3)(A), a statement of an intent to claim paternity of the child at any time prior to or within thirty (30) days after the child's birth and has notified the registry of all address changes;

(2)     The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed childplacing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; provided, that if the biological father has previously notified the department of the biological father's claim to paternity of the child pursuant to the putative father registry, § 36-2-318(e)(3), the biological father shall be subject to all the requirements for waiver of notice provisions of § 36-2-318(f)(2) and to all requirements for filing a paternity petition;

(3)     The biological father is recorded on the child's birth certificate as the father of the child;

(4)     The biological father is openly living with the child at the time the adoption proceeding is commenced and is holding himself out as the father of the child; provided, that if custody of the child has been removed from the biological mother by court order, notice shall be given to any man who was openly living with the child at time of the initiation of the custody or guardianship proceeding that resulted in the removal of the custody or guardianship of the child from the biological mother or biological father, if the man held himself out to be the father of the child at the time of the removal; or

(5)     The biological father has entered a permanency plan under title 37, chapter 2, part 4, or under similar provisions of any other state or territory in which the biological father acknowledges paternity of the child.

11

In its final order, the trial court found the existence of three termination grounds applicable to putative fathers. Although the trial court's application of these grounds indicates that the trial court impliedly found Father to be a putative father, the trial court did not expressly find that Father fit the statutory definition. We note that Father did not dispute before the trial court, and he has not disputed on appeal, the trial court's implied finding in this regard.

DCS documents entered as exhibits at trial demonstrated that Mother had specifically identified Father as the biological father of the Child to DCS workers and that Father had not disputed that claim. Moreover, the parties stipulated at trial that Father had undergone a DNA test during the pendency of the proceedings at DCS's request and that the results of the test indicated that Father was the Child's biological father. Accordingly, pursuant to Tennessee Code Annotated § 36-1-117(c)(2), Father was a putative father unless he had become a "legal" father.

As potentially applicable to Father, the statutory definition of a "legal parent" provides in pertinent part:

> A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to § 24-7-113, § 68-3-203(g), § 68-3-302, or § 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country[.]

Tenn. Code Ann. § 36-1-102(29)(A)(iv). Tennessee Code Annotated § 24-7-113(a) (West July 1, 2022, to current) further provides that "[a] voluntary acknowledgment of paternity" "shall constitute a legal finding of paternity" when it is "completed under § 68-3-203(g), § 68-3-302, or § 68-3-305(b)," each of which requires the signatures of both parents in varying situations.

Because we have neither evidence that Father had ever been adjudicated as the legal father of the Child nor proof that he had signed a voluntary acknowledgment of paternity, we conclude that the trial court properly applied the grounds for termination of parental rights provided in Tennessee Code Annotated § 36-1-113(g)(9)(A) to Father. *See, e.g., In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *5 (Tenn. Ct. App. Apr. 14, 2020) (explaining that because "there [was] no dispute that Father [was] the biological parent of the child" but "he [had] not been established as a legal parent," "grounds applicable to both parents generally and putative fathers specifically [were] appropriate"). As this Court has noted, "[t]hese grounds [provided in section § 36-1-

12

113(g)(9)(A)] are less difficult to prove than the grounds in Tenn. Code Ann. § 36-1-113(g)(1)-(8) . . . partially because they do not include a willfulness requirement." *In re E.C.*, 2017 WL 2438574, at *8 (quoting *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *9 (Tenn. Ct. App. Apr. 25, 2005)). We will now address whether each of the § 36-1-113(g)(9)(A) grounds found by the trial court was proven by clear and convincing evidence.

### 1. Failure to Timely File Petition to Establish Parentage

This statutory ground applicable to a putative father provides in pertinent part:

> The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity . . . .

Tenn. Code Ann. § 36-1-113(g)(9)(A)(v). The statute further defines "notice" as follows:

> (B)(i) For purposes of this subdivision (g)(9), "notice" means the written statement to a person who is believed to be the biological father or possible biological father of the child. The notice may be made or given by the mother, the department, a licensed child-placing agency, the prospective adoptive parents, a physical custodian of the child, or the legal counsel of any of these people or entities; provided, that actual notice of alleged paternity may be proven to have been given to a person by any means and by any person or entity. The notice may be made or given at any time after the child is conceived and, if not sooner, may include actual notice of a petition to terminate the putative father's parental rights with respect to the child;
>
> (ii) "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father, or possible biological father, of the biological mother's child[.]

The trial court found in its final order that Father "did not file a petition to establish paternity of the Child within thirty (30) days after notice of alleged paternity and, in fact, never filed anything or took any action to establish paternity of the Child[.]" The court further found that Father was on notice of alleged paternity "from, at least, March 24, 2022, when he was served with the original Petition to find the Child dependent and neglected[.]"

On appeal, Father does not refute these facts. The evidence demonstrated that (1) Father was present at the hospital after the Child's birth, (2) he was aware of the DCS

13

proceedings[5] and the allegation that he was the Child's biological father, and (3) the results of Father's DNA test indicated that he was the Child's biological father. However, Father never filed a petition to establish paternity. Accordingly, the trial court did not err in terminating Father's parental rights based upon its finding by clear and convincing evidence that Father had failed to file a petition to establish parentage within thirty days after receiving notice of his alleged paternity.

## 2. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated § 36-1-113(g)(9)(A)(iii) provides as an additional ground for termination of parental rights applicable to putative fathers that "[t]he person has failed to manifest an ability and willingness to assume legal and physical custody of the child." In finding that this ground had been proven by clear and convincing evidence in its final order, the trial court made a conclusory statement to this effect in its conclusions of law. However, in other factual findings, the trial court additionally found that "Father's actions which led to his incarceration demonstrate Father's failure to manifest an ability and willingness to assume . . . custody of the Child." The court further found that Father's only evidence concerning his willingness to assume custody was his testimony that he "wants to be a father." As discussed in a prior section of this Opinion, the court also found in its termination order that Father had been on notice concerning his parentage of the Child since at least March 24, 2022, but he had never filed a petition to establish his paternity.

It is well established that a parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the child. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018); *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018). Our Supreme Court has recently noted the "nearly identical" language between this statutory ground applicable to putative fathers and the first prong of the statutory ground provided in Tennessee Code Annotated § 36-1-113(g)(14). *See In re Neveah M.*, 614 S.W.3d at 677. In holding that § 36-1-113(g)(14) "places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child," the High Court cited with approval its earlier discussion in *In re Bernard T.* of the same statutory language in § 36-1-113(g)(9)(A)(iv):

> Although our discussion of this language was not dispositive of the In re Bernard T. appeal, this Court affirmed termination of parental rights where the father had "manifested a commendable willingness to assume legal

[5] Father acknowledged at trial that he had received paperwork from DCS regarding the ongoing proceedings and had signed the "Criteria and Procedure for Termination of Parental Rights" on March 24, 2022.

14

custody of all the children" but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." 319 S.W.3d at 604. We concluded that the father's "testimony alone provide[d] clear and convincing evidence that [the father] [did] not presently have the ability to assume legal and physical custody of any of the children." *Id.* at 604-05.

*In re Neveah M.*, 614 S.W.3d at 677. Therefore, in order to establish this ground for termination of Father's parental rights to the Child, Petitioners were required to prove that Father had failed to manifest either the willingness or the ability to assume legal and physical custody of the Child. *See id.*

As this Court has explained regarding this ground:

> As to this ground, courts consider whether a father is in a position to care for the child. *See In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *8 (Tenn. Ct. App. June 6, 2017). A court looks at the father's actions, not his expressions of intention. *Id.* (citing *In re Weston T.R.*, No. M2012-00580-COA-R3-PT, 2012 WL 3804414, at *7 (Tenn. Ct. App. Aug. 31, 2012)). In *In re E.C.*, the court determined that the father's actions in violating house arrest, which resulted in his re-incarceration, evidenced "an unwillingness to act in a way that would allow him to assume custody of the child." *Id.* The Supreme Court in *In re Bernard T.*, 319 S.W.3d 586, 604-05 (Tenn. 2010), found clear and convincing evidence of the father's lack of ability to assume legal and physical custody of his children when the father "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." In the case of *In re Adoption of S.T.D.*, the court considered the father's actions with respect to his other three children who were not subjects of the appeal. *In re Adoption of S.T.D.*, 2007 WL 3171034, at *8. The father testified that he had never paid child support to these children's mothers. *Id.* At the time of trial, one child was living with the stepmother, who testified that the father "has never checked on that child and has never offered her any child support." *Id.* The court determined that the father had not manifested the ability to assume legal and physical custody of the children. *Id.*

*In re Rilyn S.*, No. E2018-00027-COA-R3-PT, 2019 WL 1130442, at *8 (Tenn. Ct. App. Mar. 12, 2019).

Upon thorough review of the record, we determine that the evidence preponderates in favor of the trial court's finding that clear and convincing evidence established this

15

statutory ground. As previously noted with respect to the similar ground found at Tennessee Code Annotated § 36-1-113(g)(14), the record demonstrated the criminal activity and instability present in Father's life before the Child's birth that led to his arrest shortly after the Child's birth. By the time of the termination trial, Father had been continuously incarcerated since his arrest at the hospital and therefore had been incarcerated for most of the Child's life. In addition, Father testified during trial that he would not be released for another four months. Due to his incarceration, Father had not established a suitable home for the Child.

Moreover, due to his continuing incarceration by the time of trial, Father clearly lacked the ability to assume legal and physical custody of or financial responsibility for the Child. *See, e.g., In re Jeremiah S.*, 2020 WL 1951880, at *8; *In re Ke'Andre C.*, 2018 WL 587966, at *11. Father had also failed to take steps to establish paternity by the time of the termination trial despite his acknowledgment at trial that he was the Child's biological father. We therefore agree with the trial court that DCS proved by clear and convincing evidence that Father failed to manifest a willingness or ability to assume custody of or financial responsibility for the Child. The trial court did not err in terminating Father's parental rights based upon this statutory ground.

### 3. Risk of Substantial Harm to the Child

The trial court also found clear and convincing evidence of the statutory ground set forth in Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv), which provides:

> Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

As this Court has summarized concerning this ground:

> The caselaw interpreting this provision offers some guidance in its application. In the case of *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *1 (Tenn. Ct. App. Apr. 11, 2016), the putative father filed an emergency petition to establish paternity shortly after the petition to terminate parental rights was filed. This court affirmed the trial court's decision to terminate the father's parental rights under Tenn. Code Ann. § 36-1-113(g)(9)(A)(v) for risk of substantial harm. *In re F.N.M.*, 2016 WL 3126077, at *14. The child had been with the prospective adoptive parents since birth. *Id.* at *12. The trial court credited expert testimony concerning the loving home provided by the prospective adoptive parents, the secure bond between the child and the prospective adoptive parents, and "the

16

adverse psychological and physical effects a child experiences if taken away from the person or persons with whom the child has bonded." *Id.* at *13. Furthermore, the proof established that the putative father had no relationship with the child, "due in large part to his incarceration for almost all of the child's life." *Id. See also State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (affirming termination on the ground of substantial harm based on evidence that the child viewed the foster parents as her parents and was attached to her siblings and that the clinical social worker's evaluation of father showed him to have a "callous disregard" for these strong bonds).

*In re Rilyn S.*, 2019 WL 1130442, at *9 (footnote omitted).

Similarly, here, by the time of the termination trial, the Child had been in the home of her foster parents for approximately fifteen months, having been placed there when Father and Mother were arrested at the hospital following her birth. Accordingly, the Child had not seen Father since the time of her birth and had no relationship with him. Instead, the Child had bonded with her foster family, including siblings, who were described by Ms. Parker as the "only family [the Child] knows." The foster family had provided for the Child's special needs and wished to adopt her.

Although we recognize our Supreme Court's holding in *In re Adoption of A.M.H.*, 215 S.W.3d 793, 812 (Tenn. 2007), that "[e]vidence that [the child] will be harmed from a change in custody because she has lived and bonded with the [non-parents] cannot constitute the substantial harm required to prevent the parents from regaining custody," a distinction exists between the situation in that case, wherein the parents had an established bond with the child prior to the child's placement with pre-adoptive parents, and a case such as *F.N.M.*, wherein the father had not established a relationship with the child prior to the child's placement. *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *11 (Tenn. Ct. App. Apr. 11, 2016) (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 812). The case at bar is factually similar to *F.N.M.* because Father had not established a bond with the Child prior to her placement with her foster parents, and the evidence established that she would experience trauma at being separated from "the only family she knows," who had provided for all of her needs since her birth.

Father, on the other hand, had not expressed any concern for the Child to Ms. Parker and had not demonstrated any urgency toward providing for the Child's needs. Father had been incarcerated since shortly after the Child's birth and had maintained no contact with the Child. Placing the Child in Father's custody would be tantamount to placing her in the custody of a "near-stranger." *See In re Elijah H.*, 2021 WL 4593844, at *12. As such, we determine that the trial court did not err in finding by clear and convincing evidence that

17

removing the Child from caregivers with whom she had bonded and placing her in Father's legal and physical custody would pose a risk of substantial harm to the psychological welfare of the Child. The trial court therefore did not err in terminating Father's parental rights pursuant to this ground.

## V. Best Interest of the Child

When, as here, a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.") (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2022, to current) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

18

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

19

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

When conducting the best interests analysis, courts must consider [the] statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should

20

then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court weighed eleven of the twenty best interest factors in favor of terminating Father's parental rights. The court did not state whether it had weighed factors (F), (G), (K), (L), (M), (N), (R), (S), or (T) in favor of or against termination of Father's parental rights. Following our thorough review of the evidence in this matter, we conclude that clear and convincing evidence supported the court's finding that termination of Father's parental rights was in the Child's best interest.

21

Father argues that the trial court failed to make specific findings of fact concerning the statutory best interest factors. We disagree. The court made specific findings throughout its order and listed the statutory best interest factors that it found applicable with factual findings supporting each. We note that "a trial court is not required to restate the relevant factual findings within the discussion of each and every ground and best interest factor to comply with section 113(k) so long as the order contains sufficient findings to explain and support the trial court's conclusions, allowing for meaningful review of the trial court's decision." *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *8 (Tenn. Ct. App. Dec. 4, 2023). We determine that the trial court has done so here. We will now address each statutory best interest factor and the evidence applicable thereto.

Factors (A), (C), and (J), are related by reason of their emphasis on the Child's stability and safety. The trial court correctly weighed these factors in favor of termination. With respect to factor (A), terminating Father's rights would not negatively impact the Child's stability. As the trial court noted in its final order, termination of Father's parental rights would actually promote the Child's stability. Based on Ms. Parker's testimony, the Child was residing in a stable, pre-adoptive home while Father remained incarcerated. At the time of trial, Father was completing a prison sentence with approximately four months remaining on his sentence. Considering that Father had neither been present in the Child's life since the time of her birth nor would be for some time to come, we agree that this factor weighs in favor of termination. Concerning factor (C), there is no evidence that Father ever contributed to the Child's needs. Father had been incarcerated for almost the Child's entire life and had never provided financial or other support. Regarding factor (J), Father's incarceration prevented him from demonstrating any lasting adjustment of circumstances or conduct such that the Child would be safe in his home. We therefore find that these factors weigh in favor of terminating Father's parental rights.

With respect to factor (R), concerning the physical environment of the parent's home, the trial court did not weigh this factor in favor of or against termination. However, we note that Father was incarcerated at the time of trial. There was no evidence that Father ever maintained a safe environment for the Child. Even before his incarceration, Father was homeless and had engaged in criminal behavior and violated his probation. We therefore determine that this factor weighs in favor of termination.

The trial court found that factor (B) weighed in favor of terminating Father's parental rights because removing the Child from her foster family would have a detrimental effect on her emotional, psychological, and medical condition. We agree. As noted in a previous section of this Opinion, "removing a child who has 'bonded and thrived' with his current family and placing a child in the custody of a near-stranger would amount to substantial harm." *See In re Elijah H.*, 2021 WL 4593844, at *12 (citing *In re Braelyn S.*,

22

No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020)). We therefore determine that this factor weighs in favor of terminating Father's parental rights.

Factors (D), (E), (H), and (I) are related due to their emphasis on parental attachments and relationships. Relative to (D), the trial court found that there was no evidence of a secure and healthy parental attachment between the Child and Father. We agree. Father had maintained no contact and had no relationship with the Child whatsoever. Relevant to factor (E), the trial court found that Father had not "maintained regular visitation or other contact with the Child to cultivate a positive relationship[.]" This finding is also supported by the proof. Father did not dispute that he had been out of the Child's life since she was approximately two days old.

Concerning factor (H), the trial court found that "the Child has created a healthy parental attachment with the Foster parents in the absence of . . . Father[.]" The evidence demonstrated that the Child had been in the home of her foster parents since she was two days old and that she had known no other family. Ms. Parker testified that the Child was very bonded to her foster family, including other children in the home and extended family members. Accordingly, the evidence supports the trial court's finding as to this factor. The trial court also properly weighed factor (I) in favor of termination for the same reason stated above.

Factors (F) and (G) relate to the Child's previous experiences in the parent's home and any trauma resulting from those experiences. The trial court omitted any reference to these factors in its analysis, presumably finding them inapplicable. Because the Child had never resided in Father's home, we agree that these factors would weigh neither for nor against termination. Similarly, factors (K) and (L) both concern services and assistance offered to Father. Again, the trial court omitted any reference to these factors in its analysis concerning Father, presumably finding them inapplicable. Due to Father's incarceration, we agree that these factors would weigh neither for nor against termination.

Factors (M), (P), and (Q) all relate to Father's actions to meet the Child's needs. Although the trial court did not specifically address factor (M) in its analysis, we conclude that it would weigh in favor of termination inasmuch as Father had not "demonstrated a sense of urgency in establishing paternity of the child[.]" We agree with the trial court's determination that factors (P) and (Q) weigh in favor of terminating Father's parental rights. Regarding factor (P), we reiterate that Father had not been involved in the Child's life at all due to his criminal activity and incarceration. Accordingly, Father did not maintain an understanding of the Child's basic or specific needs. With respect to factor (Q), we consider that Father had been incarcerated throughout most of the Child's life. However, even before Father was incarcerated, he was living in a motel room with Mother,

23

who was using illegal drugs while pregnant with the Child. Therefore, we cannot conclude that he "demonstrated the ability and commitment to creating and maintaining a home" that would meet the Child's needs. The trial court correctly determined that factors (P) and (Q) weighed in favor of terminating Father's rights.

The evidence also supports the trial court's finding that factor (O) weighed in favor of terminating Father's parental rights. No evidence was presented that Father had "ever provided safe and stable care for the child or any other child[.]" The trial court omitted any reference to factors (N) and (S) in its analysis, presumably finding them inapplicable. Based on the evidence and circumstances presented here, we agree that these factors would weigh neither for nor against termination.

In sum, the evidence established that the applicable statutory factors weigh in favor of terminating Father's parental rights to the Child. No factors weigh in favor of maintaining his parental rights. We therefore affirm the trial court's determination by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Father's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Ethan H.

s/Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE

24